IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Dean A. Devine, Administrator of the Estate of Nicole M. Devine, Dec'd, | CASE NO.: 1:16 CV 2994 |
| Plaintiff, | JUDGE DONALD C. NUGENT |
| v. | |
| Officer Michael Sevel, et al., | MEMORANDUM OPINION |
| Defendants. | |

This matter is before the Court on the Defendants' Motion for Summary Judgment. (ECF #44).[1] For the reasons that follow, Defendants' Motion for Summary Judgment is granted.

## FACTS[2]

Plaintiff Dean Devine, as administrator of his daughter Nicole Devine's estate, filed this action in the Court of Common Pleas for Lake County, Ohio against the City of Willoughby, five individual police officers and 10 un-named John Does alleging federal claims under 42 U.S.C. §

---

1

Defendants have also filed a Motion to Strike Evidence regarding Defendant Ashton's resignation from the Willoughby Police Department as a result of an investigation into sexual relationships he had with women while on duty. (ECF #58) That motion is granted because the evidence related to Lt. Ashton's resignation is irrelevant to the matter before the Court and is offered merely to assess credibility. However, in reviewing a motion for summary judgment, the Court will not make credibility determinations. *See Thomas v. Arnold*, 696 F.Supp.2d 882, 886 (N.D. Ohio 2010)(citation omitted).

2

Except as otherwise cited, the factual summary is based on the Complaint and the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving party.

1983 for violations of the State Created Danger Doctrine; a supervisory liability claim against Defendant Lt. Ashton and a Municipal Monell liability claim, along with several state law claims. Defendants removed the action to this Court on December 14, 2016. Plaintiff voluntarily dismissed individual Defendant Sergeant Dan Pitts on June 19, 2017 (ECF #16) and in response to Defendants' Motion to Summary Judgment voluntarily withdrew his state law claims and his claim for Municipal liability. Thus, the only claims remaining are Plaintiff's claims against individual Defendants Officer Michael Sevel, Officer David A. Burrington, Officer Charles A. Krejsa and Lieutenant Richard T. Ashton for violations of 42 U.S.C. § 1983 pursuant to Plaintiff's State-Created Danger and supervisory liability claims. (See ECF #55 at 1)[3]

The events at issue here occurred on Saturday night, November 22, 2014 and into the morning of November 23, 2014. Nicole Devine and her boyfriend of approximately four years, Dominic Julian, attended a fundraiser for a friend with cancer at a bar called The Boardwalk. After approximately four hours, Ms. Devine and Mr. Julian left the fundraiser and stopped at another bar before going to a party at a friend's house on Adkin's Road. Both Ms. Devine and Mr. Julian were drinking beer throughout the night. Ms. Devine left the party when Mr. Julian and another man began shouting at each other. She attempted to drive her father's car, which was blocked in by another car, and ended up crashing into the other car. At that point she exited the car and began walking the two miles home to Fox Run Apartments. Mr. Julian walked after her. At that point, Plaintiff, said he was not concerned for Ms. Devine's safety when she walked away from the party with Mr. Julian. (Devine Dep. at 45-46)

---

[3] The 10 John Doe defendants have not been identified so those fictional defendants are dismissed.

Shortly thereafter, around 12:30 a.m., the police responded to a call of a disturbance on Adkins Road. The narrative report of the dispatch stated that "Male just hit a female. Caller states the male was wearing a flannel shirt and female is yelling 'get off me.' They are closer to Lost Nation, about two streets down, north side of the street. Squad call. No transport." (Burrington Dep. 17-19 and Exhibit 1) The narrative report was written by one of the dispatchers, and although the Willoughby Officers did receive some of the information via radio dispatch, they did not receive all of the information. (See ECF #52, Gammier Dep at 29, 45; ECF #53, Thomas Dep at 18) At the time that the Officers responded to the call, the incident was reported as a disturbance call. (Krejsa Dep at 5) Officers Sevel, Burrington, Krejsa and Lt. Ashton responded to the dispatch. Lt. Ashton was the first to arrive on scene. He states that when he arrived he observed a woman walking about five feet in front of a male. The female indicated that she did not want to speak to Lt. Ashton and continued walking. Lt. Ashton told Mr. Julian to put his hands on the front of the squad car. He noticed that Mr. Julian did not appear disheveled, and his clothes were not dirty or torn. Lt. Ashton examined his hands and knuckles which did not appear to be bruised or bloody. In other words, he noted that there was no physical evidence that Mr. Julian had been in a fight. (Ashton Dep. 9-10). Lt. Ashton stated that similarly, from his initial impression from his observation of Ms. Devine, it did not appear that she had been involved in a recent altercation because she was not disheveled or muddy, although there was dried blood around her nose. (Id. at 10).

Officer Burrington arrived on scene next, and like Lt. Ashton, tried to talk to Ms. Devine who walked by him. He also noticed the dried blood under her nose. Joining Lt. Ashton, Officer Burrington asked Mr. Julian if he had any weapons on him. Mr. Julian told him he had a knife.

3

Officer Burrington patted Mr. Julian down, felt bulges and asked Lt. Ashton who was wearing gloves, to reach in. Lt. Ashton pulled out the knife and a bag of marijuana. (Burrington Dep. 7, 10-11). A small spot of blood was found on the left rear pocket of Mr. Julian's pants. Mr. Julian told Officer Burrington that he had wiped it off Ms. Devine's face. (Id. at 23) Mr. Julian denied hitting Ms. Devine and said he did not know why she had blood under her nose. (Id.) Officer Burrington said that Mr. Julian did not appear intoxicated but did appear agitated based on his demeanor with the Officers, his short responses to questions, "kind of a little bit cocky." (Id. at 20) Officer Burrington contacted Jake Hardy, the man who made the 911 call to ask him if Mr. Julian was the male that struck the female. (Id. at 18, 26) Officer Burrington said that Mr. Hardy could not identify the male because his vantage point was not good enough and denied seeing him hit her. (Id. at 18)

Officer Sevel was next on the scene and as he saw Lt. Ashton and Officer Burrington talking to Mr. Julian, he stopped Ms. Devine and spoke with her. (Sevel Dep at 6) Officer Sevel observed the dried blood around Ms. Devine's nose, smelled alcohol coming from her person and noticed some slurring in her speech. She did not appear to be intoxicated but clearly had been drinking. (Id. at 11-12). Ms. Devine told Officer Sevel that she had been at a party and had gotten into a scuffle with someone or had broken up a fight between two males at the party. (Id. at 10, 28) Officer Sevel said that according to both Mr. Julian and Ms. Devine there was no physical altercation between them. (Id. at 31). Ms. Devine repeatedly told the Officers that nothing happened and she wanted to go home. (Id. at 10). Officer Krejsa was last to arrive on scene as backup. When he arrived on scene he saw Officer Sevel speaking with Ms. Devine and Mr. Julian seated in the back of a police car. (Krejsa Dep. at 6, 12-13).

The rescue squad was called to evaluate and attend to Ms. Devine. Lt. James Ulle, Firefighter/EMT Zachary Sitz and Firefighter/Paramedic James Jerson manned the Rescue Squad. Ms. Devine was escorted inside the Rescue Squad and was given a 4x4 and a bottle of sterile water to wipe the dried blood from her face. The Firefighter's report states that Ms. Devine was alert and oriented x3 and admitted to use of alcohol. When asked how she received her injury, she told the Firefighters that she stepped between two males who were fighting at a party. The report notes that there were no visible injuries to Ms. Devine's face such as cuts and bruises. (Ulle Dep at 54) Ms. Devine refused repeated offers to take her to a hospital. She told the Firefighters that she was fine and just wanted to go home and/or she wanted to go home with her father. Ms. Devine signed the Willoughby Fire Department Release Form and exited the Rescue Squad. (Ulle Dep., Ex. 1, at 45-46). At some point during the time that Ms. Devine was in the Rescue Squad, Officers Burrington and Sevel joined them in the Squad. Ms. Devine repeatedly told the Officers that nothing happened and that she wanted to go home. Officer Burrington said that Ms. Devine said she wanted to go home with Mr. Julian and she denied that Mr. Julian had hit her. (Sevel Dep at 10, 13, 28, 36; Burrington Dep at 12, 27, 12-13).

After Ms. Devine exited the Rescue Squad, Officer Krejsa asked her if there was another location, other than the Fox Run apartment where she could go. Ms. Devine did not answer Officer Krejsa. (Krejsa Dep at 13) Officer Krejsa stated that while Ms. Devine was being treated in the Rescue Squad, a member of the Fire Department approached him while he was sitting in his squad car and told him that Ms. Devine had told the Firefighters that she suffered her injury at a residence while trying to separate two males who were in a fight. (Id. at 18) Officer Krejsa also stated that Ms. Devine insisted on talking to Mr. Julian and he told her that she would need to

5

speak to Officer Sevel because Mr. Julian was seated in a squad car. (Id. at 19) At some point Officer Krejsa must have spoken to Mr. Julian because he states that Mr. Julian told him that he was trying to be a peacemaker and a good guy by following Ms. Devine after she walked away from the party to make sure she was safe because she was drunk. (Id. at 19-20)

Mr. Julian received a citation for the marijuana that had been found in his pocket. After the Officers conferred, they concluded that they could not determine that Mr. Julian had struck Ms. Devine. Both Mr. Julian and Ms. Devine denied that he had hit her. Further, it was determined that Ms. Devine and Mr. Julian lived together and that they would be transported home. (Sevel Dep at 31-32) Mr. Julian and Ms. Devine were transported home to Fox Run Apartments by Officer Sevel. (Id.) During the short drive to Fox Run, Mr. Julian said he was upset that he was receiving a citation and seemed agitated. (Id. at 33-34) Ms. Devine was relaxed and carefree. (Id. at 33) When they pulled into the apartment complex, Mr. Julian told Officer Sevel that Ms. Devine seemed scared. (Id. at 34) Officer Sevel had a private conversation with Ms. Devine to check if anything was wrong. Consistent with her statements throughout the encounter, Ms. Devine told Officer Sevel that she was fine and wanted to go to bed. (Id. at 34-36) At that point Ms. Devine went inside and Officer Sevel and Mr. Julian waited outside for Officer Burrington to arrive with a copy of Mr. Julian's citation. Once Mr. Julian had been provided with a copy of the citation, Officer Sevel and Officer Burrington left Fox Run. (Burrington Dep. at Ex. 1, p. 6- Investigative Report of Sevel; P. 8 - Investigative Report of Burrington).

At some point after the police left Ms. Devine and Mr. Julian off at Fox Run, Mr. Julian killed Ms. Devine. The Willoughby Police Department investigated the death and Mr. Julian was charged with murder and felonious assault. Mr. Julian eventually pled guilty to the murder charge

and the felonious assault charge was dismissed. He was sentenced to fifteen years to life and is currently serving that sentence.

## STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence

7

presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## ANALYSIS

### A. State Created Danger Claim

In general, a state's failure to protect an individual against private violence does not constitute a violation of the United States Constitution. *DeShaney v. Winnebago Cnty. Dept. of*

*Social Services*, 489 U.S. 189 (1989). The Sixth Circuit has recognized exceptions to this rule including the state created danger exception which Plaintiff claims is applicable here. *See Id.*; *Carver v. City of Cincinnati*, 474 F.3d 283 (6th Cir. 2007). Under the state created danger exception, a duty to protect arises when affirmative acts of the state expose the individual to, or increase his risk of exposure to, private acts of violence. *DeShaney*, 489 U.S. at 196; *Pierce v. Springfield Township, Ohio*, No. 1:11-CV-847, 2013 WL 12099085, at *5 (S.D. Ohio May 21, 2013), *aff'd*, 562 F. App'x 431 (6th Cir. 2014). If the state created danger exception is not applicable, no constitutional violation has occurred. *Carver*, 474 F.3d at 286.

In order for the state created danger doctrine to apply here, the Plaintiff must demonstrate the following:

> 1) an affirmative act that creates or increases a risk that the decedent would be exposed to private acts of violence;
>
> 2) a special danger to the decedent, such that the defendants' acts placed decedent specifically at risk; and
>
> 3) that defendants knew or should have known their actions specifically endangered the decedent.

*Carver*, 474 F.3d at 286 citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir.1998). A failure to act is not an affirmative act under the state created danger theory. *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). Thus, to prevail on this claim, Plaintiff must demonstrate that the Defendants' affirmative acts created or increased the risk that Ms. Devine would be murdered by Mr. Julian. The critical question is "not whether the victim was safer during the state action, but whether he was safer *before* the state action than he was *after* it." *Id.*, citing *DeShaney*, 489 U.S. at 201. (emphasis in original) Each element of the test will be addressed in order.

## 1. Affirmative Act

Plaintiff asserts that Defendants' affirmative acts increased Mr. Julian's anger towards Ms. Devine and, therefore, increased the risk that he would beat her to death. Specifically, Plaintiff asserts that Mr. Julian was affirmatively placed in the back of a police car during the investigation and was cited for possession of marijuana. Thereafter, instead of separating Ms. Devine from Mr. Julian by arresting him for assault or domestic violence, the police dropped them off at home thereby removing Ms. Devine from the relative safety of the public street. However, the evidence in the record does not support a finding that these acts created or increased the risk that Ms. Devine would be exposed to a private act of violence by Mr. Julian.

First, the police were required to respond to the 911 disturbance call. Upon reaching Mr. Julian and Ms. Devine walking separately down Adkins Road, they properly investigated whether there was probable cause to arrest Mr. Julian for assault or domestic violence. No person may be arrested, consistent with the requirements of the Fourth Amendment, without probable cause. *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000).

> Generally, probable cause exists when the police have "reasonably trustworthy information ... sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). "Probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *See Dietrich*, 167 F.3d at 1012. "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir.1995).

*Id.* Based upon the Defendant Officers' knowledge at the time of their stop of Mr. Julian and Ms. Devine there was no probable cause to arrest Mr. Julian for assault or domestic violence.

Upon their arrival on the scene, the Officers observed that Ms. Devine was walking ahead of Mr. Julian down the street. The Officers agree that while both Mr. Julian and Ms. Devine had been drinking, they were not intoxicated or impaired. They were not stumbling or weaving. Other than the old, dried blood under Ms. Devine's nose, neither Mr. Julian nor Ms. Devine appeared to be bruised, disheveled or showed any other physical signs of having been in a recent physical fight. Lt. Ashton specifically examined Mr. Julian's hands to determine if they showed signs of fighting. The Officers observed a spot of blood on Mr. Julian's back pocket which he explained as having occurred when he wiped blood from Ms. Devine's nose. Both Ms. Devine and Mr. Julian denied repeatedly that Mr. Julian had struck Ms. Devine. Both Ms. Devine and Mr. Julian stated that Ms. Devine's injury occurred when she attempted to break up a fight at the party that she and Mr. Julian had attended. The 911 caller, when contacted by Officer Burrington at the scene, said it was too dark to identify the alleged assailant or victim and thus could not corroborate that an assault had occurred. The only description the caller had given to dispatch was that the assailant was wearing a flannel shirt. Mr. Julian was not wearing a flannel shirt. Based upon these facts, there was no probable cause to arrest Mr. Julian for assault or domestic violence. The only offense noted by the Officers was Mr. Julian's possession of a bag of marijuana, for which he was properly cited. Moreover, and more importantly, there is no liability under the state created danger theory for a police failure to arrest because a failure to arrest, or to not find probable cause, is not an affirmative act.

The only affirmative act that Plaintiff points to in this sequence is placing Mr. Julian in the back of a squad car. Plaintiff speculates that this action made Mr. Julian angry at Ms. Devine. Plaintiff does not, and cannot credibly argue that the police should not have investigated the

11

disturbance call or that they should not have questioned Mr. Julian in the squad car. There was no evidence to the Officers on the scene that placing Mr. Julian in a squad car created or increased any danger to Ms. Devine.

As an arrest was not warranted by their investigation, the Officers determined that they could either allow Mr. Julian and Ms. Devine to walk home to the Fox Run Apartments or give them a ride to their shared home.[4]

Plaintiff asserts that the Officers' decision to take the couple home, removing Ms. Devine from the relative safety of the public street, was an affirmative act that increased the threat that she would be subject to private violence. That argument is specious because, ultimately, regardless of whether Mr. Julian and Ms. Devine walked home or were given a ride, they still would have ended up in the same place. In keeping with the Department's practice of separating individuals that have been involved in a disturbance, Officer Krejsa offered to take Ms. Devine to a different location. However, Ms. Devine ignored that offer and kept repeating that she wanted to go home to sleep and she wanted to see and talk to Mr. Julian. Upon reaching Fox Run, Officer Sevel asked Ms. Devine privately if everything was alright and she responded that she was fine and just wanted to go to bed. Based upon the evidence in this record, no affirmative act by these defendants created or increased the risk that Ms. Devine would be exposed to a private act of violence by Mr. Julian.

---

[4] While Mr Julian's record address was not the Fox Run apartment, the Officer's inquiries at the scene led them to conclude that Mr. Julian resided at Fox Run.

## 2. Specific Danger to Ms. Devine

The second element of the state created danger exception is that the victim faced a special danger, that the Officers' acts placed the victim specifically at risk, as distinguished from the public at large. See *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) Plaintiff argues the Defendants' act of driving the couple home after issuing Mr. Julian a citation for possession of marijuana, increased the danger to Ms. Devine and placed her specifically at risk. Plaintiff's argument here again runs afoul of the conclusion above, that is, that Ms. Devine's risk of private violence was not altered by the Officers' affirmative act of driving the couple to their ultimate destination. They were going home, either on foot or car, the method of their transport home did not create or increase the risk of danger to Ms. Devine.

### 3. Whether the Officers knew or should have known their actions specifically endangered Ms. Devine.

Finally, review of the evidence known by the Officers at the time of their interaction with Ms. Devine and Mr. Julian, does not show that the Officers knew or should have known that their actions specifically endangered Ms. Devine. Plaintiff argues that Defendants had reason to believe and should have known that Mr. Julian had struck Ms. Devine several times while walking on Adkins Road; that both Mr. Julian and Ms. Devine were drunk and that Ms. Devine could not make safe choices for herself; Mr. Julian was uncooperative and agitated; and that Ms. Devine was afraid of Mr. Julian. With this knowledge Plaintiff asserts, Defendants knew or should have known that driving the couple home endangered Ms. Devine.

The record, however, does not support these "known facts". The Officers knew they were responding to a physical disturbance call. They did not know whether Mr. Julian had struck Ms.

13

Devine while walking on Adkins Road. The Officers investigated whether Mr. Julian had assaulted Ms. Devine and, as detailed above, found no evidence of assault by Mr. Julian. Further, the only evidence regarding the couple's intoxication level was the personal observations of the Officers. All of the Officers agreed, based upon their training and the appearance and reactions of the couple, that both Mr. Julian and Ms. Devine had been drinking but that neither were impaired or intoxicated. None of the Officers believed, based upon their observations at the scene, that Ms. Devine was intoxicated to the point that she could no longer make safe choices for herself. There is no record evidence to the contrary.[5] The fact that Mr. Julian was agitated or uncooperative did not raise any particular concern for the Officers and did not raise any concern regarding Ms. Devine's safety. Indeed, after Mr. Julian told Officer Sevel that Ms. Devine seemed to be afraid when they arrived at Fox Run, Officer Sevel had a private conversation with her to see if anything was wrong or if she was afraid. Ms. Devine told Officer Sevel that she was fine, nothing was wrong and that she wanted to go to bed. Based upon this conversation and the earlier investigation at the scene, there is no genuine issue of material fact regarding whether the Defendants knew or should have known that their actions specifically endangered Ms. Devine.

This record fails to support Plaintiff's § 1983 claim under the state created danger theory and Defendants are entitled to summary judgment on this claim.

---

[5] Indeed, the Officers' findings are mirrored by the reports of the three Firefighters who responded to the scene. They talked extensively with Ms. Devine, noted her lack of any obvious injury and her refusal of further treatment. Also, she told them the dried blood on her face was the result of breaking up a fight between two males at a party.

## B. Supervisor Liability Claim

Plaintiff asserts that Lt. Ashton's personal participation and his orders to the other Officer Defendants make him liable under a theory of supervisory liability. The Sixth Circuit has made clear that supervisory liability under § 1983 cannot be based solely upon the right to control employees or the failure to supervise, control or train the offending individual unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006) *citing Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.1982)). "At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *McQueen*, 433 F.3d at 470 (citations omitted.) These principles make clear that a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor. *Id.*

In this case there has been no unconstitutional conduct by any subordinate officer or by Lt. Ashton himself, since he participated in the investigation and interaction at issue. Since Plaintiff has failed to demonstrate that the Defendant Officers' conduct fell within the state created danger exception, the Officers' failure to protect Ms. Devine from private acts of violence did not violate the Constitution. As such there is no liability under § 1983 for any Defendant.

## C. Qualified Immunity

Defendants assert that they are entitled to qualified immunity with respect to the claims

against them because Ms. Devine's constitutional rights were not violated, and even if some question of fact remained on that question, the Defendants' actions were reasonable in light of clearly established law and the information that they possessed.

Determining a public official's entitlement to qualified immunity presents a two-step inquiry. First, the court must determine, judged in the light most favorable to the party asserting the injury, whether the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no constitutional right would have been violated on the facts alleged, the inquiry stops and the officer will be entitled to qualified immunity. *Id*. If a violation can be made out based on a favorable view of the pleadings, the court must determine whether the right at stake was clearly established. *Id*. As determined above, there was no constitutional violation and Defendants are entitled to summary judgment on Plaintiff's state created danger and supervisory liability claims. As such, Defendants are entitled to qualified immunity.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF #44) is granted as to all remaining claims.

IT IS SO ORDERED.

/s/ Donald C. Nugent
DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE

DATED: May 16, 2018